**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,** | |
| **v.** | **CRIM. NO. 10 Cr. 798 (PAC)** |
| **AMAURY LOPEZ, SR.,**<br>**Defendant.** | |

## DEFENDANT'S MOTION FOR A NEW TRIAL IN THE INTEREST OF JUSTICE PURSUANT TO RULE 33

### I. Preliminary Statement

On September 21, 2011, Mr. Lopez, Sr. was convicted, before this Court, of one count of conspiracy to distribute, or possess with intent to distribute, a controlled substance and one count of attempt to distribute, or possess with intent to distribute, a controlled substance under 21 U.S.C. §§ 841, 846.   Prior to trial, the undersigned, moved this Court to sever Mr. Lopez Sr. from the other co-defendants pursuant to F. R.of Crim. P.14.   This motion was denied.   On September 15, 2011, during the Government's case in chief, the undersigned renewed the motion for severance following the court's receipt of notes from jurors indicating confusion as to the relevance of a confidential witness's testimony surrounding a murder that had occurred during the term of the conspiracy.   A different juror had also requested previously that the charges be explained, because he or she was confused as to whether the defendants were actually charged with murder, as well as why the murder was

being discussed in such detail.

At trial, the government introduced testimony by a confidential witness, Mr. Lennyn Mendez, regarding a murder of Javier Sanchez.  Mr. Sanchez was a partner of Mr. Mendez's in the drug trade. (Tr. at 364).  In 2003, Mr. Mendez suspected that Mr. Sanchez had robbed him of approximately $300,000. (Tr. at 365-369).  Mr. Mendez also testified that, in 2004, Amaury Lopez, Jr. approached him with fears that Javier Sanchez was going to rob him as well. (Tr. 372).  Following this conversation, Mr. Mendez and Mr. Lopez, Jr., paid for an assassin to come from Puerto Rico to kill Mr. Sanchez. (Tr. 373).  Mr. Mendez testified that on the day of the murder, he dropped off the murder weapon for the assassin to pick up, and then identified Mr. Sanchez so the assassin murdered the accurate target. (Tr. 378-80).  The assassin then approached Mr. Sanchez and shot him four or five times, in broad daylight, and in the presence of friends and family. (Tr. 380).  Notably, the government never produced any testimony or evidence linking Mr. Lopez, Sr. to the murder in any way.  None of this testimony implicated Mr. Lopez, Sr., and at no time did the government present any evidence that Mr. Lopez, Sr. was involved in, or even aware of, the murder.  This Court, though, denied the renewed motion for severance

Without severance, this evidence was presented against Mr. Lopez, Sr. as well, despite its relation solely to defendants Lopez, Jr. and Morel.  This testimony spanned nearly two full days of a seven day trial, and during that time, Mr. Lopez Sr's name was not uttered once as one who had any connection to the murder.  However, in fact, this tangential testimony only served to sow confusion amongst jury members, and

-2-

resulted in substantial and unfair prejudice to Mr. Lopez, Sr. This confusion raises a serious question as to whether the jury has made an unreliable judgment regarding Mr. Lopez, Sr. In addition, Mr. Lopez, Sr. was ultimately deprived of a fair trial, in violation of his Due Process rights, due to the confusion stemming from the murder testimony. Accordingly, this Court should grant the instant motion for a new trial in the interest of justice pursuant to Rule 33.

## II. <u>Legal Standard</u>

Rule 33 states that "the court may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. The rule by its terms gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir.1992). In essence, the district court should strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury. <u>United States v. Autuori</u>, 212 F.3d 105 (2d Cir. 2000). The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. <u>See</u> <u>Sanchez</u>, 969 F.2d at 1414. The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. <u>Id.</u> In addition, the district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. <u>Id.</u>

# III. Argument

**A.**  **Mr. Lopez Sr should have been severed from his co-defendants because the overly excessive testimony regarding the Javier Sanchez murder caused confusion amongst the jury as to the charges against Mr. Lopez, Sr., inflamed the jury and caused him substantial prejudice.**

The Supreme Court of the United States has held that severance is warranted where failure to sever would "prevent the jury from making a reliable judgment about guilt or innocence." United States v. Zafiro, 506 U.S. 534, 539 (1993). The Court has also held that when analyzing a jury's judgement or verdict "the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." Kotteakos v. United States, 328 U.S. 750, 764 (1946). Although the Second Circuit has held that a trial court's decision not to sever "will be reversed only upon the appellant's successfully assuming the heavy burden of showing that he suffered substantial prejudice due to the joint trial," that burden is met here. United States v. Cunningham, 723 F.2d 217, 230 (2d Cir. 1983). The Supreme Court's holding Zafiro is also instructive here. The Court specifically noted that "evidence of a co-defendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty." 506 U.S. at 539.

In our case, the testimony by Mr. Mendez, the government's confidential informant, regarding the murder of Javier Sanchez extended over the course of two full days. Significantly, Mr. Lopez, Sr. was not involved in the murder in any way. In fact, during the course of this testimony regarding the Sanchez murder, Mr. Lopez Sr's

name was never uttered.  To make matters worse, the extensive testimony regarding the Sanchez murder led to great confusion among the jury.  Three different jurors were so confused they wrote notes to the Court seeking explanation of the charges and nature of the trial. (Tr. at 526, 643).  While it is unknown whether the other nine members of the jury were similarly confused, these notes represented irrefutable proof that the Sanchez murder evidence, caused confusion and concern about the actual charges involved in the trial. (Tr. at 526, 643).  Multiple jurors expressed confusion as to whether the trial was in fact about the Sanchez murder.  Most importantly, despite Mr. Lopez Sr's lack of connection to the Sanchez murder, the joint trial created the very grave risk that Mr. Lopez was associated with a murder in which he played absolutely no role.

Thus, a juror confused as to the charges at issue, or the involvement of parties in the Sanchez murder, could easily have confused the involvement of Mr. Lopez, Sr.'s co-defendants in the murder, and mistakenly attributed it to Mr. Lopez, Sr. himself. Likewise, the jurors could have easily been confused by the joint trial and therefore assumed that all three defendants were responsible for the Sanchez murder, even though Mendez never mentioned Mr. Lopez, Sr. as being involved in any manner, at any time.  Indeed, the government never produced any evidence that Mr. Lopez, Sr. was even aware of the murder, before or after its commission.  The lack of severance facilitated a juror's confusion that all three defendants were complicit in all the activities of the conspiracy, whether separately charged or not.  The fact that three jurors submitted notes regarding the murder testimony only further highlights this

fact. <u>See</u> <u>Zaifro</u> <u>Supra</u>, at 539.(stating that the risk of a jury's confusion is heightened "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability")

Although the government will likely argue that the evidence of the Sanchez murder would have been elicited against Mr. Lopez, Sr. even if he was tried separately, this conclusion is far from certain. In evaluating the government's argument , it is important to note that Mr. Lopez, Sr.'s defense is <u>not</u> that no conspiracy existed, but that he was not a member of any alleged conspiracy.  Given this defense, the probative value of the Mendez testimony is non-existent, because it does not connect Mr. Lopez, Sr. to the conspiracy in any way, nor does it shed light on his intent or motive in entering any conspiracy.  The Government may argue that they are entitled to bring out the Sanchez murder under <u>Giglio</u>, but given Mr. Lopez Sr's lack of involvement, the risk of tying Mr. Lopez Sr. to a cold-blooded murder, greatly outweighs the reward of any impeachment value.

Furthermore, although the Government may argue that much of the evidence regarding the details of the Sanchez murder was brought out by defense co-counsel, the government certainly did their part.  For instance, the Government's final piece of evidence before resting was to enter the death certificate of Javier Sanchez, and to point out that the cause of death was "a gunshot wound of head with perforations of skull and brain."  (Tr. at 949) - despite arguing that they would not  introduce the "gruesome details" of the Sanchez murder (See Gov't Opposition Memorandum),

Lastly, regardless of why the testimony came in, it is safe and reasonable to say

that there is a strong likelihood that if Mr. Lopez, Sr. was severed from his co-defendants and tried separately, the Sanchez murder evidence would have been greatly curtailed, if allowed at all, and the threat of confusion or unfair prejudice would have been greatly diminished.

Although "substantial prejudice is not established merely because a defendant might have a better chance for acquittal at a separate trial," "[t]here comes a point, however, when it is obvious to the Court that no cautionary jury instructions can protect the right of a defendant to a fair trial and when that occurs, the severance should be granted." United States v. McAllister, CRIM5:91CR00049 (WWE), 1992 WL 363601 (D. Conn. Nov. 12, 1992) (citing United States v. Tutino, 883 F.2d 1125, 1130 (2d Cir.1989), cert. denied, 493 U.S. 1081 (1990)).  This point was reached when the jurors' notes made it clear that they had trouble understanding the charges against Mr. Lopez, Sr., as well as the relevance of the murder testimony of Mendez.  At that point, if not earlier, Mr. Lopez, Sr.'s motion to sever should have been granted, and the failure to do so has resulted in unfair prejudice, an unreliable judgment, and a manifest injustice.  For these reasons, the Court should grant the instant motion for a new trial in the interests of justice.

**B.** **The Mendez testimony regarding the Sanchez murder served to confuse the jury as to the charges against Mr. Lopez, Sr., as well as his alleged involvement in the conspiracy, and thus deprived Mr. Lopez, Sr. of a fair trial, in violation of his Due Process rights.**

It is well known that "[t]he right to a fair trial by a jury of one's peers is unquestionably one of the most precious and sacred safeguards enshrined in the Bill

of Rights." <u>Nebraska Press Ass'n v. Stuart,</u> 427 U.S. 539, 572 (1976) (Brennan, J., concurring).  Moreover, "So basic to our jurisprudence is the right to a fair trial that it has been called 'the most fundamental of all freedoms.' It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression." <u>Id.</u> at 586 (<u>quoting</u> <u>Estes v. Texas</u>, 381 U.S. 532, 540 (1965)).  In our case, Mr. Mendez' testimony regarding the Sanchez murder served to inflame and unfairly influence the jury against Mr. Lopez, Sr., despite the fact that he played absolutely no part in the homicide.  As a result, violated Mr. Lopez Sr's Due Process rights.  Thus, this Court should grant the instant motion in the interests of justice as the sole curative measure.

At trial, the introduction of evidence unrelated to Mr. Lopez, Sr. was both confusing to the jury  and unfairly prejudicial to him, thus depriving him of his Due Process rights and right to a fair trial.  The testimony by Mr. Mendez of a murder in which Mr. Lopez, Sr. played absolutely no part only served to confuse the jury as to his involvement and possibly tainted his involvement in the conspiracy in the eyes of the jury by grouping him with co-defendants who were alleged to be directly involved in the Sanchez murder.  This confusion is evidenced by the three notes from jurors on two separate occasions during the trial.  In addition, the evidence against Mr. Lopez, Sr. was not so overwhelming as to render the Mendez testimony harmless error.  <u>Cf.</u> <u>United States v. Castano</u>, 999 F.2d 615, 618 (2d Cir. 1993) (entry of improper evidence is harmless error if other evidence of guilt is overwhelming).  Instead, the government produced very little evidence with regard to Mr. Lopez, Sr.'s guilt, which instills

further doubt that the convictions against him may have been based solely on the jury's confusion, or the unfair prejudice created by the Mendez testimony.

Because the jury's verdict cannot said to be a reliable judgment of Mr. Lopez, Sr.'s guilt or innocence, and because the prejudice created by the proceedings is a miscarriage of justice, this Court should grant the motion for a new trial under Rule 33.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Honorable Court grant the Mr. Lopez Sr's Motion in its entirety.

Dated:          November 7, 2011
                New York, New York

                              Respectfully submitted,

                              SULLIVAN & BRILL, LLP

                              /S/ Steven Brill
                              _____
                              By: Steven Brill

                              115 Broadway, 17th Floor
                              New York, New York 10006
                              (212) 566-1000
                              Email: Steven.Brill@sullivanbrill.com

## <u>CERTIFICATION</u>

This is to certify that on November 7, 2011, a copy of this Motion was served *by email* and *ECF* upon United States Attorney's Office for the Southern District of New York.


                                           _/S/__Steven Brill_____
                                             Steven Brill