IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>AMAURY LOPEZ, SR.,<br>Defendant. | CRIM. NO. 10 Cr. 798 (PAC) |

<u>AMAURY LOPEZ SR'S SENTENCING MEMORANDUM<br>PURSUANT TO THE UNITED STATES SENTENCING GUIDELINES<br>AND 18 U.S.C. § 3553(a)</u>

TO THE HONORABLE
PAUL A. CROTTY
UNITED STATES DISTRICT JUDGE
FOR THE SOUTHERN DISTRICT OF NEW YORK

*Preliminary Statement*

Mr. Lopez is scheduled to be sentenced on May 16, 2012, after a jury convicted him of violating 21 U.S.C. §§ 864 and 841. Based on the statutory mandatory minimum sentence of 20 years (due to government's filing of a "prior felony information") and a Sentencing Guideline range of 360 Months-Life (due to Mr. Lopez's Criminal History) there are no real disputes between the parties regarding Mr. Lopez's sentence exposure. In a nutshell, the Court is faced with the decision of sentencing Mr. Lopez to term of between 20 years to life. Ultimately, frankly speaking, no matter what the Court decides within that range, Mr. Lopez,

who is now an unhealthy, 70 year old man, will most likely die in prison.  Put another way, any sentence within this range is tantamount to a sentence of life.

The purpose, therefore, of this filing is to apprise the court of certain factors – sanctioned by 18 U.S.C. § 3553(a) that are relevant to Mr. Lopez's sentence and will hopefully lead this Court to take a "parsimonious" approach and sentence Mr. Lopez to term of 20 years, which, given his lengthy history of debilitating illness and drug addiction,  is a sentence "sufficient, but not greater than necessary."

***Mr. Lopez's "history and characteristics" are mitigating factors.*** [1]

A.  FAMILY HISTORY

Amaury Lopez Rivera was born on September 7, 1941 of the union of Suzanna Rivera and Pedro Lopez.  Amaury is the second of eight children born to his parents.  Amaury was born in San Turse, Puerto Rico where his parents lived all their lives.  Both parents are deceased.  His mother died eight years ago following an asthma attack.  His father died twelve years ago of similar circumstances.

Mr. Lopez's oldest brother, Eugenio Lopez, is about seventy-five years old and lives in Puerto Rico.  Amaury does not have contact with him.  His younger brother, Edwardo, is sixty-five and lives in a psychiatric institution in Puerto Rico.  According to Amaury, Edwardo was struggling with depression and drug addiction

---

[1] In preparation of this report, a thorough background investigation of Amaury Lopez was conducted by Nancy Tricamo, CSW a sentencing mitigation specialist.  This investigation included numerous interviews with Mr. Lopez, and a review of Mr. Lopez's current medical records from the Bureau of Prisons.  In addition to interviews, numerous conversations were held with Mr. Lopez's attorney, Steven Brill.  Legal documents were also reviewed as well as relevant records

for many years and two years ago attempted suicide by jumping from a second floor window.  He suffered brain damage following this fall and is now incoherent.  He will not be released from the facility where he resides.  His next brother, Ephraim Lopez died when he was twenty-four from AIDS.  He was an intravenous drug user.  His next brother, Antonio Lopez, died at the age of fifty-two while living in a psychiatric facility in Puerto Rico.  Antonio suffered from mental illness most of his life and was medicated from a very early age.  He was also violent and needed to be contained to an institution for most of his adult life.   The next sibling in line was Guillermo Lopez, who died at the age of thirty after being struck in the head with a bat during a fight.  He was also addicted to heroin.  The youngest brother, Miguel Lopez resides in Puerto Rico and is thirty-five.  Amaury does not have contact with Miguel and he is not aware of his circumstances and/or functioning.

When asked about the tragedies that beset his brothers and what may have contributed to their demise (as well as his own) Amaury discussed his father and how he raised the family.   Pedro Lopez was a butcher in the small town where they lived, and also sold vegetables.  This is how the family was supported.  Although his father made a decent living, a good deal of his money went toward drinking.  Pedro Lopez was an aggressive and violent drunk.  He would often focus his aggression on Amaury's mother, and would beat her in front of the children.  Amaury, being one of the older sons in the family often tried to defend her.  This action would commonly result in his father focusing his violence on Amaury.

In addition to his violence, Pedro Lopez would often disappear from the family home for several days at a time. This would leave his family without resources for the time he was gone and he would often come back with no money. There was a great deal of chaos and friction in his childhood home and his siblings and Amaury suffered the consequences of this instability, having little guidance or resources to enter the world as well-functioning adults.

Amaury Lopez attended school in Puerto Rico until the fifth grade. He reports that his family was in need of financial help and his father did not find school important. He also states that most of his siblings did not continue school much beyond this level. As a result of his limited education, Amaury Lopez cannot write and only reads a limited amount of Spanish. He is not fluent in English in any form. Mr. Lopez is ashamed of his illiteracy and feels it limited his options greatly in the world as an adult. He worked odd jobs as a youngster, worked the docks loading ships in San Juan and eventually was trained in welding. He was able to help support his family through his earnings.

On the day John F. Kennedy was shot, November 22, 1963, Amaury Lopez moved from Puerto Rico to New York. He was twenty-two years old. A woman he had been dating in Puerto Rico, Carmen Ramirez, came with him. This relationship would go on to last over 50 years. Amaury and Carmen lived together in the Bronx and to support themselves, both worked in factories upon their arrival. Amaury also worked as a mechanic periodically, but this was mostly done on the street in his spare time. They both followed this path for a while before starting a

family in the early 1970's. Their first child, Amaury Lopez, Jr. was born in 1973 and is now thirty-nine. They then had two other children, Maribel Lopez, thirty-seven and Wanda Lopez, twenty-five.

### B. SUBSTANCE ABUSE HISTORY

Amaury Lopez began using various substances when he was a teenager in Puerto Rico. When he arrived in New York, however, his drug use escalated. In 1969, he was introduced to heroin by a friend. He began his use by means of snorting the substance, which he then continued doing for the next fifteen years. In his late thirties, however, he could no longer become high by snorting the drug and began injecting it. This was the beginning of Mr. Lopez's lengthy and destructive addiction to intravenous heroin use.

Amaury Lopez readily admits his heroin addiction was the driving force of his life for many, many years. This addiction interfered with all aspects of his functioning, including his work, health, relationships and parenthood. Unable to maintain regular employment, Mr. Lopez began to work the streets, selling drugs in order to use. He was arrested and convicted of drug related crimes on numerous occasions, all he reports related to his addiction.

Amaury Lopez is covered in scars due to his injecting heroin. He reports the scars are not only on his arms, but cover his legs as well. His addiction was out of control for many years and he did not receive any treatment until years into his use. Eventually, Mr. Lopez requested help from a local drug treatment program, Carmen Capelli, in the Bronx. He was successful for a brief period of time but

started using again. This pattern continued with Mr. Lopez entering treatment, staying sober for periods from a few weeks to a few years, and then using again. In the process of his many years of addiction, Mr. Lopez lost his jobs, home, wife and children. He went in and out of prison, the longest related sentence being 7 years in a New York State prison. At the height of his use, Mr. Lopez was spending anywhere from $100-200 per day to support his habit.

Eventually, Mr. Lopez entered a methedone maintenance program. The program he attended was run out of St. John's Hospital in the Bronx, and was called Willow Drug Treatment Program. About three years ago, Mr. Lopez transferred his use to methedone and received continuous help through this program. Upon his arrest, Mr. Lopez was immediately placed in the "box" where he underwent detox from methedone. He spent twenty-one days there and has reportedly been clean since this time.

C.  MEDICAL HISTORY

Amaury Lopez is a sick man. He is almost 70 years old and has many health issues. The most serious of Mr. Lopez's medical issues is his diagnosis of stomach cancer. On 2/14/11, Mr. Lopez received a gastrectomy to remove the obstruction in his gastrointestinal tract. Following surgery his condition is monitored by the medical department of the Metropolitan Correctional Center where he is housed. Mr. Lopez complains of continued pain and gastrointestinal difficulties and worries that his health is not being supervised properly by the Bureau of Prisons.

In addition to his diagnosis of stomach cancer, Mr. Lopez suffers from numerous other conditions. As a result of recent evaluations conducted at the Bureau of Prisons he has been diagnosed as having an enlarged prostate, a positive PPD test for tuberculosis, Hepatitis C, Cirrhosis of the Liver, Asthma, Arthritis, weight loss and an Anxiety Disorder. Most recently, he was diagnosed with a hernia at the sight of his surgery. He is frail and it is difficult for him to get around the jail. He is often in pain and uncomfortable, and is not being treated for pain management.

On top of his dire medical condition, Mr. Lopez suffers from anxiety and depression. He has had increasing anxiety since his diagnosis with cancer, and has struggled with feelings of depression. At times, Mr. Lopez has thoughts of suicide, feeling hopeless about his situation and the quality of the rest of his life. He has few visitors, does not socialize much at the jail and feels very alone. He is being treated for his psychiatric conditions by the facility, but his anxiety and depression symptoms continue.

### *The "nature and circumstances of the offense" warrant a sentence below the guidelines and no greater than the statutory mandatory minimum.*

While Mr. Lopez clearly played a role in the instant drug conspiracy, it was by no means a major one. By all accounts, Mr. Lopez was not a leader or manager of the conspiracy. He made no real decisions about the course of the conspiracy, played no real serious part in the negotiations, and had no discretion about the terms of any drug transactions. Although he spoke occasionally on the telephone with a government informant, the conversations contained much

hyperbole and very little substance.  Any remarks about acts of violence did not involve his acts.  Specifically, a remark regarding a gun and drugs in a safe deposit box involved the distant past and was never substantiated by any evidence at trial.  Furthermore, the Court is urged to consider the remarks about the "French Connection" and his "1980 Chevrolet" as corroboration that Mr. Lopez was truly a washed-up, old-timer, who spoke most often of the past and had very little affect on what occurred during the term of the instant conspiracy.

### *The need for a "Just punishment" and the goals of deterrence and protection are adequately met by adopting the arguments of this motion.*

Frankly, the chances are extremely slim that Mr. Lopez will survive the pendency of his sentence.  If, by some chance, he does, he will be at least 90 years old.  Suffice it to say, the care he receives while incarcerated, while adequate, is not what he would receive if released.  So, as Mr. Lopez becomes more and more debilitated, his quality of life will diminish significantly. By his own choice of engaging in a life of drugs and criminal activity, he has lost everything.  In fact, given the life that his son, Amaury, Jr., has chosen, Mr. Lopez will most likely never see him again as well.  Furthermore, with a sentence of 20 years, the message that "crime doesn't pay" has clearly been sent – with respect to drug cases in general, and to anyone associated with Mr. Lopez in particular. Indeed, the goal of "protection" is obviously met by the simple fact that in essence the sentence is a life term.

It is therefore urged that this Court, while it contends with a statutory

mandatory minimums, it also, at the same time, exercise its discretion to ensure that the sentence imposed complies with the requirements of § 3553(a), as applied to this specific case and sentence Mr. Lopez to a prison term of 20 years.

I CERTIFY that a copy of this motion has been served via ECF and Email upon:

Assistant United States Attorney David Miller

RESPECTFULLY SUBMITTED.

In New York, New York, May 12, 2012.

                              SULLIVAN & BRILL, LLP

                              /S/ Steven Brill

                              By: Steven Brill

                              115 Broadway, 17th Floor
                              New York, NY 10006
                              (212) 566-1000
                              E-Mail: steveb@sullivanbrill.com