**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :
**UNITED STATES OF AMERICA**                      :
                                                 :          **S2 10 Cr. 798-02 (PAC)**
       **v.**                                     :
                                                 :
**AMAURY LOPEZ SR.,**                             :
                                                 :
                        **Defendant.**            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

David Miller/Aimee Hector
Assistant United States Attorneys
    – Of Counsel –



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

May 14, 2012

**BY ECF AND HAND DELIVERY**

The Honorable Paul A. Crotty
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   United States v. Amaury Lopez Sr., S2 10 Cr. 798-02 (PAC)

Dear Judge Crotty:

The Government respectfully submits this letter in connection with the May 16, 2012 sentencing of defendant Amaury Lopez Sr. (the "defendant" or "Lopez Sr."), and in response to the defendant's May 12, 2012 sentencing submission ("Def Ltr."). As set forth herein, the Government believes that a sentence within the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 360 months' to life imprisonment, as set forth in the Pre-Sentence Report ("PSR"), is reasonable and appropriate given the nature and seriousness of the offense. Notably, the PSR recommends a Guidelines sentence of 360 months' imprisonment. Furthermore, as discussed below, a sentence within the Guidelines range is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## FACTUAL BACKGROUND

### A.    The Lopez Organization

From at least 2002 through September 2010, Amaury Lopez Jr. ("Lopez Jr.") was the leader of a large-scale cocaine trafficking organization (the "Lopez Organization") that shipped

The Honorable Paul A. Crotty
May 14, 2012
Page 2

hundreds of kilograms of cocaine from Puerto Rico to New York for distribution.[1]  The Lopez
Organization employed numerous individuals who assisted the illegal drug-trafficking operation.
Lopez Jr. and his co-conspirators utilized both human couriers and the mails to accomplish their
unlawful objectives.

　　　Lopez Sr. worked with Lopez Jr. in coordinating drug shipments from Puerto Rico and
providing the drugs to Lopez Jr.'s distributors.  Fabio Morel ("Morel") was Lopez Jr.'s right-
hand man, and worked for Lopez Jr. in retrieving and distributing narcotics that had been shipped
to the New York City area.  Maribel Lopez was involved in the Lopez Organization's shipment
of money from the New York City area to Puerto Rico to pay for narcotics that would be shipped
back.  Lopez Sr., Morel, and Maribel Lopez thus performed key functions for the Lopez
Organization in the packaging, receipt and distribution of cocaine in the United States, and the
handling of narcotics proceeds, much of which was transported back to Puerto Rico.  William
Pozo ("Pozo") assisted Morel in distributing some of the Organization's narcotics.

　　　Maribel Lopez and Pozo pled guilty prior to trial.  The Government filed a Prior Felony
Information against Lopez Jr., Lopez Sr., and Morel prior to trial.  Trial commenced against
Lopez Jr., Lopez Sr., and Morel before this Court on September 12, 2011 on Indictment S2 10
Cr. 798 (PAC), and concluded on September 21, 2011.  The Superseding Indictment charged that
from in or about 2002 through in or about September 2010, the defendants conspired to distribute
and possess with intent to distribute five kilograms and more of cocaine (Count One); Lopez Jr.
and Morel were each charged with a substantive offense of distribution and possession with
intent to distribute 500 grams and more of cocaine (Counts Two and Three), and Lopez Sr. was
charged with attempting to distribute and possess with intent to distribute five kilograms and
more of cocaine (Count Four).  On September 21, 2011, the jury found all three defendants guilty
on all charges.

**B.　　　The Trial and the Evidence**

　　　The Government called 13 witnesses at trial, and introduced numerous exhibits proving
the defendants' guilt, including documents and drugs seized over the course of the conspiracy.
Law enforcement witnesses and cooperating witnesses conclusively established the existence and
operation of the Lopez Organization's cocaine business from in or about 2002 through in or
about September 2010; how the Organization shipped and distributed cocaine and drug money;
and how the business spanned from Puerto Rico to New York City.  The evidence showed that
over the conspiracy period, the Lopez Organization sold and distributed at least 1,000 kilograms
of cocaine.  Furthermore, the Government introduced numerous recorded conversations of the

---

　　　[1]  The information provided in the factual background discussed herein is derived from
testimony and evidence admitted at trial.  This information is also provided in the PSR from
paragraphs 1 through 37.

The Honorable Paul A. Crotty
May 14, 2012
Page 3

defendants discussing their narcotics activities, which proved the defendants' guilt through their own words.

At trial, the Government proved the facts set forth below concerning the operation of the Lopez Organization, its conduct and means, and the actions of the trial defendants, Lopez Jr., Lopez Sr., and Morel.

*How the Organization Operated*

The Lopez Organization operated by purchasing cocaine in Puerto Rico, which was then prepared for shipment to the United States via mailing services and in suitcases aboard airplanes. The cocaine was often secreted inside aluminum cans disguised as food products, among other methods of transport.  Once the cocaine arrived in the United States, it was distributed to mid-level traffickers in the New York area.  Sale of the Lopez Organization's cocaine resulted in profits of millions of dollars, which were collected by members of the Organization and then prepared for shipment back to Puerto Rico.  Often, the U.S. currency was hidden inside vacuum-sealed bags or cans and transported to Puerto Rico via human couriers or through the mail.[2]

Lopez Jr. used other conspirators to secure cans, sealing machines, and stamping machines to transport cocaine and currency in his narcotics business.  Some of the cans were from the Freund Container Supply Company (referenced below).  At one point, Lopez Jr. also had another conspirator investigate and order candles, in which Lopez Jr. intended to ship cocaine.

*The Organization's Use of Violence and Weapons*

Members of the Lopez Organization used weapons and violence to maintain control of the Organization's workers, drug trafficking territory, and proceeds.  Many members of the Organization carried firearms, including .40 caliber and 9 millimeter firearms and an Uzi, and possessed other paraphernalia, such as bullet proof vests.  The evidence further demonstrated that the success and longevity of the Lopez Organization was owed primarily to Lopez Jr.'s reputation for violence.  Lopez Jr. exerted control over his underlings through violence, fear, and intimidation, and exacted retribution on individuals who threatened the Organization either by theft or by cooperating with law enforcement.

---

[2] Notably, as introduced at trial, in a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel discussed how they purchased cocaine in Puerto Rico and shipped it to New York for sale.  (*See* Government Exhibit ("GX-") 700-T).  As the Government showed at trial, this recording was essentially a primer on how the Lopez Organization operated its narcotics business.

The Honorable Paul A. Crotty
May 14, 2012
Page 4

Indeed, members of the Lopez Organization utilized those firearms when necessary to protect the Organization's profits.  To this end, and as established at trial, in August 2004, Lopez Jr., Fabio Morel, a shooter named Carlito, and a cooperating witness killed an individual named Javier Sanchez because the Organization believed that Sanchez had stolen the cooperating witness's drug proceeds and threatened to steal proceeds belonging to Lopez Jr.  The cooperating witness had 9mm and Desert Eagle Smith & Wesson .40 caliber handguns and provided the .40 caliber to Lopez Jr. for the Sanchez murder.

The Government also introduced at trial evidence of another example of Lopez Jr.'s use of violence to protect his drug business.  At one point, a cooperating witness (and fellow drug dealer) told Lopez Jr. that there was an unsuccessful robbery of his apartment where drug proceeds were stored.  The dealer told Lopez Jr. that he saw a suspicious Nissan Murano vehicle parked nearby when this occurred.  After being informed of the unsuccessful robbery, Lopez Jr. later believed a Nissan Murano had followed him and so Lopez Jr. fired a gun at the Nissan.

Furthermore, the evidence at trial showed that Lopez Jr. stored guns in his home in Englewood Cliffs, New Jersey, and in his Hummer, which had a secret compartment inside. Lopez Jr. shipped handguns from Puerto Rico by breaking them apart.  Moreover, Lopez Jr. had an Uzi stored at his child's mother's home for protection.  Similarly, as noted in a May 19, 2009 recorded conversation, Lopez Sr. admitted that he had maintained a gun and drugs in a safety deposit box.  (*See* GX-901-T).

Notably, as the evidence at trial showed, Lopez Jr. would threaten any individual who spoke with law enforcement about the Organization's activities.  By way of example, when Lopez Jr. found out that Pozo had been arrested and had spoken with law enforcement, he was furious and stated, in sum and substance, that Pozo's leg should be chopped off.

*Seizures of the Organization's Drugs, Guns, and Money*

Throughout the course of the conspiracy, law enforcement seized drugs, guns and money belonging to the Lopez Organization.  Evidence was presented at trial establishing the facts set forth below.

<u>December 30, 2002 Cash Seizure at JFK Airport</u>

On December 30, 2002, approximately $130,000 U.S.C. contained in a vacuum-sealed bag was seized from carry-on luggage at JFK Airport.  A courier told law enforcement that the money was from sale of a restaurant by courier's parents – a restaurant licensed to Theresa Flynn, one of Lopez Jr.'s girlfriends.

The Honorable Paul A. Crotty
May 14, 2012
Page 5

<u>May 2005 Cash Seizure in Puerto Rico Post Office/UPS Store</u>

In May 2005, approximately $365,000 U.S.C. contained in aluminum cans were seized at a Post Office/UPS store in Puerto Rico.  The following pertinent facts concerning this seizure, among others, were established at trial:

- Morel attempted to pick up the money using a fake identification.
- UPS logs showed that Morel had been picking up packages at the store for over a year.
- Express mail receipts for those packages indicated the packages had been sent from the same non-existent Yonkers address (13 Knowles Street) that Lopez Jr. used when he bought his Hummer.
- In an interview with law enforcement, Morel admitted that he had been going to the UPS store since 2003.
- Morel admitted to lying about his identity.
- Prior to the seizure, a cooperating witness brought approximately $150,000 in narcotics proceeds to the Lopez residence at 357 North Broadway in Yonkers, New York.  Lopez Jr. and Morel were already at the apartment.  A short time later, Maribel Lopez arrived with an additional $180,000 in cash.  The money was counted using a money counter.  This money was packaged, sent to Puerto Rico, and seized.

<u>July 26, 2006 Seizure of Drugs, Guns, and Cash in the Bronx</u>

On July 26, 2006, approximately 7.8 kilograms of cocaine, 344 grams of heroin, 115 grams of crack, a scale/kilo press, two handguns, and U.S.C. were seized from a stash house on Gun Hill Road in the Bronx, New York.  The drugs had been packaged in the hallmark of Lopez Organization (vacuum sealed in plastic bags with numbers on each half kilo).  Furthermore, the apartment had been used by an individual (Jairo Tavarez) who was a Lopez Organization customer.  Notably, the name "Amaury" was found in a drug ledger in the apartment.

<u>February 18, 2009 Drug Seizure at JFK Airport</u>

On February 18, 2009, approximately six kilograms of cocaine in aluminum cans were seized from two suitcases at JFK Airport.  During the February 2009 recorded conversations introduce at trial, Lopez Sr. discussed finding someone to pick up the suitcases at JFK Airport.

The Honorable Paul A. Crotty
May 14, 2012
Page 6

<u>March 27, 2009 Drug Seizure at Yonkers Post Office</u>

On March 27, 2009, approximately one kilogram of cocaine in an aluminum can was seized at a Post Office in Yonkers, New York.  The following pertinent facts concerning this seizure, among others, were established at trial:

- In or about March 2009, law enforcement officers conducted surveillance at the Yonkers Post Office after learning that an aluminum can containing approximately one kilogram of cocaine was shipped to the Post Office for pick up by a Lopez Organization co-conspirator, Jesus Soto.  (Law enforcement seized the package.).
- In the course of the surveillance, law enforcement officers observed Lopez Sr. arrive with Jesus Soto, and then circle the Post Office in an effort to conduct counter-surveillance.  Shortly thereafter, Lopez Jr. and Maribel Lopez arrived in another vehicle and also conducted counter-surveillance of the Post Office.  After Lopez Sr. dropped Soto off at the Post Office, Soto was arrested as he attempted to claim the package, and Lopez Sr., Lopez Jr. and Maribel Lopez sped off from the location.
- In a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel spoke about getting Soto a lawyer.

<u>April 29, 2009 Drug Seizure at Bronx Hotel</u>

On April 29, 2009, approximately four kilograms of cocaine were seized in the vicinity of the Van Cortlandt Hotel in the Bronx, New York.  The following pertinent facts concerning this seizure, among others, were established at trial:

- Lopez's cocaine was delivered to the hotel.  Morel was there.  Pozo arrived later. Law enforcement officers had the hotel under surveillance.
- The drugs were delivered inside cigar boxes with cigars clued on top, and those cigar boxes were contained in suitcases.
- The drugs were removed from the containers and Pozo left with them in a backpack.  Morel then tried to dispose of evidence of the four kilograms by throwing out the remaining trash.
- Pozo was arrested near the hotel after he left with the drugs.
- Morel was then arrested.

<u>September 9, 2010 Drug Seizure in the Bronx</u>

On September 9, 2010, approximately 1.5 kilograms of cocaine were seized in the Bronx, New York.  In early September 2009, a cooperating witness and Lopez Jr. negotiated a 1.5

The Honorable Paul A. Crotty
May 14, 2012
Page 7

kilogram cocaine transaction.  (Recordings of these conversations were made.).  On September 9, 2010, the cooperating witness got 1.5 kilograms from a Lopez Jr. worker, provided it to law enforcement, and thus was not able to pay Lopez Jr. for the product.   Lopez Jr. was angered by the lack of payment, and continued to harass the witness for the money.  Lopez Jr. made clear that he is "the one who gives orders here."  (GX-707-T).

> *Lopez Jr. Is Arrested*

On October 6, 2010, Lopez Jr. was arrested.  In his vehicle was a catalogue from the Freund Container Supply Company addressed to "Maribel Lopez" at the 357 North Broadway address referenced at trial. As described above, trial evidence demonstrated that hundreds of aluminum cans were purchased by the Lopez Organization from the Freund Container Supply Company to secret both cocaine and money for shipment to and from Puerto Rico.  Furthermore, at his arrest, Lopez Jr. had in his possession an April 29, 2009 surveillance video of the Van Cortlandt Hotel – the same night that approximately four kilograms of cocaine were seized and where Morel and Pozo were arrested.


## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."  *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.  *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;

The Honorable Paul A. Crotty
May 14, 2012
Page 8

> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors to Lopez Sr.'s conduct, a Guidelines sentence is clearly warranted.

### A.    Application of the Sentencing Guidelines

The applicable sentencing guidelines to the offenses charged in Count One and Count Four (against Lopez Sr. only) is U.S.S.G. § 2D1.1. (PSR ¶ 42). Pursuant to Section 3D1.2(d), Counts One and Four are grouped together because the offense level is determined largely on the basis of the quantity of the substance involved. (PSR ¶ 41). Under Section 2D1.1, the defendant's offense level is calculated as follows: the base offense level is 38 (§ 2D1.1(c)(1)); and because a dangerous weapon was possessed during the offense, two levels are added

The Honorable Paul A. Crotty
May 14, 2012
Page 9

(§ 2D1.1(b)(1)).  (PSR ¶¶ 40-49).  Lopez Sr.'s total offense level is thus 40.  (PSR ¶¶ 49, 51).
While Lopez Sr. is a career offender, pursuant to Section 4B1.1, the total offense level of 40 is
greater than that in Section 4B1.1(b), and accordingly no adjustment is made.  (PSR ¶ 50).
According to the PSR, Lopez Sr. has 18 criminal history points and is in Criminal History
Category VI (PSR ¶¶ 52-100) – and is also in Category VI as a career offender pursuant to
Section 4B1.1(b) (PSR ¶ 101) – which results in a Guidelines range of 360 months' to life
imprisonment, with a mandatory minimum term of 20 years imprisonment (pursuant to the filing
of the Prior Felony Information).  (PSR ¶¶ 159-60).

        Although no longer binding upon the Court, the Guidelines sentence of 360 months' to
life imprisonment appropriately reflects the seriousness of Lopez Sr.'s offense.  By any measure,
the Guidelines range in this case is entirely reasonable and appropriate in light of the nature and
scope of Lopez Sr.'s criminal conduct.

**B.      The Section 3553(a) Factors**

        A Guidelines sentence for Lopez Sr. is appropriate pursuant to the factors set forth in 18
U.S.C. § 3553(a).  First, the nature and circumstances of the offense clearly warrants a
Guidelines sentence.  As the PSR notes, Lopez Sr. helped coordinate shipments of cocaine from
Puerto Rico into the New York area, and he gave the cocaine to Lopez Jr. and his distributors.
Indeed, Lopez Sr. performed key functions for the Lopez Organization in the distribution of
cocaine in the United States.  As proved at trial, and as discussed above, Lopez Sr. was integrally
involved in his son's drug business, as evidenced by his actions in attempting to have someone
pick up six kilograms of cocaine at JFK Airport in February 2009, and driving Jesus Soto to the
Yonkers Post Office to pick up one kilograms of cocaine in March 2009.  Moreover, at trial, the
Government introduced recordings in which Lopez Sr. was discussing and present for
discussions with Lopez Jr. and Morel concerning their extensive narcotics trafficking.  And this
was a drug organization that was responsible for the distribution of at least 1,000 kilograms of
cocaine over the last decade.

        Moreover, as proven at trial, and as discussed above, the Lopez Organization was a
violent organization that used weapons, threats, and fear to protect their narcotics business.
Indeed, as evidenced in a May 19, 2009 recorded conversation, Lopez Sr. himself used to
maintain a gun in a safety deposit box.  (*See* GX-901-T).

        In his sentencing submission, Lopez Sr.'s counsel appears to repeat the same argument he
made to the jury: Lopez Sr. was all talk, the recorded "conversations contained much hyperbole,"
and they contained "very little substance."  (Def. Ltr. at 7-8).  But the jury clearly rejected these
baseless arguments.  Indeed, one need only look at the February 19, 2009 and February 20, 2009
telephone conversations, and the transcripts of them, which were admitted at trial, to know Lopez
Sr.'s counsel's argument lacks merit.  (*See* GX-401-T-407-T).  During those conversations,

The Honorable Paul A. Crotty
May 14, 2012
Page 10

Lopez Sr. is *actively* trying to get someone to pick up the six kilograms of cocaine, the Lopez Organization's cocaine, at JFK Airport.  Contrary to counsel's assertions that Lopez Sr. had "very little affect on what occurred during the term of the instant conspiracy" (Def Ltr. at 8), Lopez Sr.'s actions and words thus clearly show he was integrally involved.  As noted above, Lopez Sr.'s involvement in the Lopez Organization's business is also manifest from his driving of Jesus Soto to the Yonkers Post Office in March 2009 to pick up the Organization's cocaine, and his participation in the May 31, 2009 recorded conversation in which he, Lopez Jr., and Morel discuss the operation of their drug business and getting Soto a lawyer.  (*See* GX-900-T). These are not the actions or words of someone who is a "washed-up, old-timer, who spoke most often of the past" (Def Ltr. at 8), and had little involvement or effect on the conspiracy.

At bottom, Lopez Sr. actively participated in an extremely large, pervasive, and violent drug business, run by his son, and his actions contributed to the Organization's livelihood. Consequently, the nature and circumstances of the offense clearly militate in favor of a Guidelines sentence.

Second, the history and characteristics of the defendant support a Guidelines sentence. As the PSR indicates, Lopez Sr.'s criminal history dates back 45 years.  He has at least 17 criminal convictions and 13 additional arrests – all primarily narcotics, firearms, and violence-related offenses.  (PSR Add. at 36).  As the PSR aptly notes, Lopez Sr. is a "habitual recidivist and a career offender."  (*Id.*).  While Lopez Sr.'s childhood and medical circumstances are noteworthy, it is an unfortunate truth that many defendants of Lopez Sr.'s background and addiction have similar childhoods and are of ill health.  To this end, as the PSR notes, in finding that Lopez Sr.'s background does not indicate that any special treatment is warranted, the PSR states: "We know of no mitigating or aggravating factors that would warrant a sentence outside of the advisory guideline range of imprisonment."  (*Id.*).

Third, under Section 3553(a), the need for a sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered.  Here, the Government respectfully submits that a Guidelines sentence is necessary to serve this purpose.  A Guidelines sentence for Lopez Sr. will not only afford deterrence to Lopez Sr., a "habitual recidivist," but will serve to deter others in the community from engaging in similar conduct in the future.  Thus, the Government agrees with the PSR that a Guidelines sentence "would be sufficient, but not greater than necessary, to comply with the factors to be considered in imposing a sentence outlined in 18 USC 3553(a)."  (PSR Add. at 36.).

The Honorable Paul A. Crotty
May 14, 2012
Page 11

## **CONCLUSION**

      For the reasons set forth above, the Government respectfully submits that Lopez Sr.'s crimes are appropriately penalized in the Guidelines.  Accordingly, the Government requests that the Court impose a sentence within the applicable Guidelines range of 360 months' to life imprisonment, as it is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                          Respectfully Submitted,

                                          PREET BHARARA
                                          United States Attorney

                        By:        _____/s/_____
                                        David Miller/Aimee Hector
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-2484/-1944

cc:    Mr. Steven Brill, Esq. (by email)